## CARL V. LEAKE, SR., v. QUEEN CITY COACH COMPANY.

### (Filed 20 June, 1967.)

**1. Carriers § 18—**

A carrier is under duty to exercise the highest degree of care consistent with the practical operation of the business to provide for the safety of its passengers, and is under duty to protect a passenger from an assault by a fellow passenger when the carrier has knowledge, express or implied, of the danger of the assault; however only knowledge or notice to its employees may be imputed to the carrier, and the driver of a bus, whose attention is primarily demanded in operating the vehicle, can be charged with knowledge of acts of his passengers only when such acts are so unusual as to come to his attention under the exceptional circumstances.

**2. Same— Evidence held insufficient to show that bus driver had reasonable ground to anticipate assault by one passenger on another.**

The evidence favorable to plaintiff tended to show that the driver of a bus requested a loud-talking, boisterous, drunk passenger to quiet down, that the passenger promised to do so and, on his way back from the front of the bus, suddenly stuck a needle or pin into a fellow passenger's left hip, resulting in the injury in suit. There was no evidence that the bus driver had knowledge that the passenger had whiskey with him, that he had already had an altercation with another passenger, or that there had been any prior unpleasantness between the boisterous passenger and plaintiff passenger. *Held:* Nonsuit was proper, since the evidence fails to show that the bus driver had any reasonable ground for anticipating the assault on plaintiff passenger.

APPEAL by defendant from *Mallard, J.*, September Civil Session, 1966, ROBESON County Superior Court.

The plaintiff seeks to recover damages of the defendant for injuries he sustained while a passenger on the defendant's bus between the cities of Greensboro and Sanford. He alleges, and offers evidence tending to show, that on Sunday, 17 November 1962 he purchased a ticket from Reidsville to Lumberton. He boarded the defendant's bus at Greensboro, and shortly afterwards an unknown passenger (X) began conducting himself in a loud and boisterous manner, swearing and cursing, that the driver called X to the front of the bus and talked with him about his objectionable conduct. That as he, the plaintiff, was lying on his side, X jabbed a sharp instrument in him which caused pain and required treatment by a doctor who removed about one and one-half inches of the end of a pin or needle from the plaintiff's left hip. He alleges that the defendant is responsible in allowing X to remain on the bus knowing that he was intoxicated and thereby subjected the plaintiff to an unsafe condition on the bus, that he did not eject the drunk passenger from the bus and did not furnish reasonable medical care after he had been injured. The plaintiff testified that X had two pints of whiskey and

was pretty well intoxicated, that he got into an argument with two marines and struck at one of them, that the driver called him to come to him, that he was cursing, and as he started back to his seat he said, "No god damn negro ain't going to look at me after I had been treated like this . . . No damn negro is going to treat me like this"; and that upon leaving the driver and returning to his seat, he jabbed the plaintiff in the left hip with a needle about an inch and one-half long, causing him to bleed. The plaintiff reported his injury to the driver and asked that he be sent to a hospital at Sanford, but received no encouragement. Upon arriving at Lumberton, the plaintiff went to Dr. Robinson that night and then again on Monday. The pin, or needle, was removed from his hip in an operation performed by Dr. Lawrence. The plaintiff went back to see Dr. Lawrence two or three times later. He testified that he was a barber earning from $100 to $150 per week, that he was unable to work following his injuries and has never been able to resume his occupation.

On cross examination, the plaintiff testified that Mr. Norton, the driver of the bus, was a fine man, that he tried but couldn't keep order on the bus, that the person who stabbed him was pretty rowdy and didn't pay any attention to the driver, that he didn't quiet down at all, he was pretty reckless, and that he believed the driver was afraid of him. The man who stabbed him got off the bus in Sanford, and he knows nothing further about him.

Joseph Edward Norton testified for the defendant that he was driving the bus, that X boarded the bus in Greensboro and was talking a little loud. He was about five feet, six inches, real small, weighed about 120 pounds. At Siler City the driver called the person up to the front of the bus and asked him not to talk so loud, and he then went back to his seat. The driver did not observe any odor about him and did not see him with any packages. At Sanford X got off the bus, and about fifteen minutes later, Leake said, "You know that fellow who was talking too loud . . . When he comes back, will you talk to him; he stuck a pin in me." He said he was not bleeding, but it felt like a pin. The driver then offered to get a cab and take the plaintiff over to the hospital, or call a doctor. The plaintiff replied, "That will hold you up . . . we will go on." They went on to Fayetteville where the driver again asked Leake if he would like to go to a hospital, or call a doctor, which Leake declined. He testified that Leake did not at any time ask for medical assistance. That he didn't see X drink any whiskey, and didn't smell any, that he called the man up and asked him to lower his voice because some of the people liked to sleep, that X replied he would be

glad to, and he did not hear him any more. That it was his practice to immediately eject passengers when they were behaving in any manner dangerous to other passengers, and that all this passenger was doing was talking loud, and he saw no reason to have him ejected.

The following issues were submitted and answered by the jury:

"1. Was the plaintiff, Carl V. Leake, Sr., injured by the negligence of the defendant, Queen City Coach Company, as alleged in the complaint?

"ANSWER: Yes

"2. What amount, if any, is the plaintiff entitled to recover of the defendant for his personal injuries?

"ANSWER: $1,515.00"

Judgment for the plaintiff was signed upon the verdict, and the defendant excepted and appealed.

*Johnson, McIntyre, Hedgpeth, Biggs and Campbell by Ingram P. Hedgpeth, Attorneys for defendant appellant.*
*William J. Townsend, Attorney for plaintiff appellee.*

PLESS, J. The plaintiff relies upon the case of *Smith v. Cab Co.*, 227 N.C. 572, 42 S.E. 2d 657, to establish the alleged liability of the defendant in this case; but the facts in that case are noticeably different from those in the present litigation. In that case, the evidence was to the effect that the plaintiff entered the defendant's cab about 2:00 o'clock in the morning, that she was pulled out of it by a woman with whom she had had trouble earlier in the evening, that the plaintiff succeeded in getting back into the cab, and the driver was urged to drive off. This he failed to do, saying "I am going to see this well done." He did, however, let the cab roll down to a dark spot about a half a block away, with plaintiff's assailant and some of her friends still holding on to the cab and trying to fight her. Here the driver stopped the cab, got out, opened the back door, and departed, taking the switch keys. The girls were fighting her, but she could not start the cab as the driver had taken the keys. She was rescued and taken to a hospital where several stitches were taken to close a gash in her head. During the melee, plaintiff's money and goods were thrown out of the cab, scattered, and lost. In the opinion, it is said:

"Conceding that the driver of defendant's cab was under no obligation to protect plaintiff while she was on the sidewalk, or to defend her or champion her cause outside of his cab, still

it would seem that the plaintiff's testimony, that after she had gotten in the cab and the cab had proceeded half a block the driver stopped the cab, with plaintiff's assailants surrounding, and left the scene, would afford some evidence of failure to exercise due care for the protection of one whom he had accepted as a passenger in his cab, and tend to sustain an action for damages for injuries received and property lost proximately resulting therefrom."

The Court there summarized the applicable law which we herewith quote, omitting citations:

"The duty owed by common carriers to passengers being transported by them has been frequently stated by this Court to be to provide for the safe conveyance of their passengers 'as far as human care and foresight' can go, consistent with practical operation of the business. And in the performance of its duty it is obligatory upon the carrier to protect a passenger from assault, not only by the carrier's employees, but also by intruders, when by the exercise of due care the acts of violence might have been *foreseen* and avoided. This obligation on the part of the carrier with respect to the safety of passengers continues until the journey expressly or impliedly contracted for is concluded. But before liability may be predicated for the injury to the passenger, it must have proximately resulted from the negligent failure of the carrier to perform its duty. And the carrier must have known of, or had reasonable grounds to anticipate the assault by intruders, with present ability to avoid injury to the passenger by the exercise of proper care.

"We do not conceive it to be the legal duty of the driver of a taxicab to interfere in a fight on the street or sidewalk between third parties and one who is desirous of becoming a passenger but who has not entered the vehicle, but after the person has been accepted as a passenger and has entered the conveyance, the duty is imposed upon the carrier to exercise due care and vigilance to protect the passenger in transit from violence threatened by third parties when the circumstances are such as to indicate that injury to the passenger might *reasonably* be *anticipated* and avoided by the exercise of proper care. However, the carrier is not an insurer of the safety of its passenger, and can only be held liable in damages for negligent breach of its duty, proximately resulting in injury to the passenger, or causing loss of packages accepted with the passenger for transportation." (Underscoring added.)

Tested by the above rules, we are of the opinion that the driver of the defendant's bus had no reasonable grounds to anticipate an assault by the unknown passenger upon the plaintiff. Taken in the light most favorable to the plaintiff, X was a loud talking, boisterous drunk person whom the bus driver asked to quiet down. While X had had an altercation with some people sitting near him at the back of the bus, the record does not show that they complained. There had been no kind of unpleasantness between him and the plaintiff and nothing to cause the bus driver to suspect an attack upon the plaintiff or any other passenger. The only knowledge or notice imputed to the defendant would be that of the driver. The latter did not see X drink any whiskey, smell any odor on him, or see him with any packages which might have contained liquor, or know of his striking one of the marines. When he asked him to lower his voice because some of the people liked to sleep, X replied he would be glad to, and he, the driver, did not hear him any more.

It was immediately following this peaceable attitude on the part of X that he stuck the pin or needle in the plaintiff as he was returning to his seat at the back of the bus. Since the plaintiff was lying on the seat with his hips exposed to the aisle, it is entirely likely that the action of X was impetuous in that the position of the plaintiff presented a target and a temptation which he could not resist.

On this bus, as in practically all of them, the carrier has only one employee — the driver. His primary duty is to give his full attention to the operation of the bus. If he concentrates his faculties upon this all-important duty, he is not likely to observe the conduct of the passengers except in most unusual cases. In the average bus, thirty or forty feet long, and with as many as sixty passengers, the noise of the bus and the voices of the passengers in conversation would prevent him from hearing anything at the back of the bus except extremely loud noise. And with duty of watching the road in front and other vehicles behind, through his rear view mirrors, he cannot give attention to the actions of the passengers unless so unusual as to demand it.

Here the driver, Norton, had seen no trouble from X but had learned (the record doesn't show how) that he was talking loudly. Upon being asked to lower his voice, X said he would be glad to, and returned toward his seat. There was nothing in his demeanor to cause Norton to foresee any trouble, there had been no altercation or unpleasantness between X and the plaintiff, and no reason for the driver to anticipate an attack on the plaintiff who had no connection with whatever X's previous conduct had been.

We are of the opinion that the facts in this case are governed by the rule laid down in *Mills v. R. R.*, 172 N.C. 266, 90 S.E. 221. In that case it appeared that a passenger, who was drinking, stumbled over a basket of eggs belonging to the conductor. They were in the baggage car, and the conductor told the passenger that he could not ride in the baggage car and that he then returned to his seat in the coach. Later, the plaintiff, who was also drinking, had an altercation with the other passenger, and they had a fight, resulting in injuries to the plaintiff. The Court held that these facts were not sufficient to go to the jury and ordered that the cause be nonsuited.

In *Pride v. R. R.*, 176 N.C. 594, 97 S.E. 418, the Court said:

> " 'The negligence for which the railway is held liable is not the wrong of the fellow-passenger or the stranger, but is the negligent omission of the carrier's servants to prevent the wrong from being committed. In order that such omission may constitute negligence, there is involved the essential element that the carrier or his servants had knowledge, or with the proper care could have had knowledge, that the wrong was imminent, and that he had such knowledge or the opportunity to acquire it sufficiently long in advance of the infliction of the wrong upon the passenger to have prevented it with the force at his command.' Hutchison on Carriers, § 980.
>
> "The converse of this proposition is equally true that the carrier is not responsible for injuries resulting from the unauthorized acts of strangers which could not be reasonable foreseen or anticipated by the exercise of ordinary care . . ."

We are of the opinion that the defendant's motion for judgment of nonsuit should have been allowed.

Reversed.